UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 16-cr-00132-01 & 02 |
| VERSUS | JUDGE HICKS |
| ERASMO AVILES, JR. (01)<br>FRANCISCO GUARDIOLA (02) | MAGISTRATE JUDGE HORNSBY |

## REPORT AND RECOMMENDATION

**Introduction**

Defendants Erasmo Aviles, Jr. ("Aviles") and Francisco Guardiola ("Guardiola") are charged with one count of conspiracy to possess with intent to distribute large quantities of methamphetamine and powder cocaine and two counts of possession of methamphetamine with intent to distribute. Defendants' arrests occurred following two traffic stops on Interstate 20 in Bossier Parish, Louisiana. Before the court are Defendants' **Motions to Suppress**. **Docs. 33 and 36**. For the reasons that follow, it is recommended that Defendants' motions be **denied**.

**Facts**

Trooper Brent Peart and Trooper George Strickland are part of a four person team known as the Criminal Patrol Unit of the Louisiana State Police, Troop G. Their focus is on intercepting drivers who may be engaged in drug trafficking, human trafficking, and other serious crimes. Trooper Peart is the team leader.

On May 12, 2016 at approximately 8:30 a.m., Peart and Strickland were sitting side-by-side in the median of I-20 perpendicular to (facing) the eastbound lanes at milepost 27. Trooper Peart was parked on the right, which was closest to the approaching traffic, and Trooper Strickland was parked on the left. They observed a brown Yukon SUV and a black Impala traveling eastbound. Both vehicles were traveling about five miles below the speed limit, but as both vehicles passed the troopers, the drivers quickly decelerated such that the front end of their vehicles dipped downward.

The troopers saw both drivers push back on the steering wheel in an attempt to hide themselves behind the b-pillar of the vehicles. (The b-pillar is the frame of the car near the seatbelt mechanism.) The Yukon had a temporary Texas license plate and only one male occupant. The Impala, which was following the Yukon, also had a Texas license plate and only one male occupant. The troopers could not tell the race or ethnicity of the drivers at this time.

Troopers Peart and Strickland knew, based on their training and experience, that subjects involved in criminal activity will sometimes travel together in separate vehicles. The troopers testified that when a group of people travel together for some distance, it is usually for a vacation or other trip, with multiple occupants in each vehicle. A small group would usually travel together in one car. The troopers testified it is unusual for two lone males to travel together in separate vehicles over a long distance for legitimate reasons. Accordingly, the troopers suspected that the drivers of the Yukon and Impala were traveling together and

might be engaged in criminal conduct. If they could find a reason to stop the vehicles, they wanted to do so.

Trooper Peart and Trooper Strickland pulled out onto the interstate, and as they did so, they observed both vehicles simultaneously move from the right lane to the left lane and then back to the right lane. The vehicles moved at the same time and used the same number of blinker clicks as they did so, which is very common for vehicles traveling together. Trooper Peart placed himself behind the Yukon (the lead vehicle), and he saw the driver looking back at him through his side mirror. Peart then observed the vehicle cross the white fog line with at least 20% of the vehicle's width, in violation of La. R.S. 32:79. Peart activated his overhead lights and began the traffic stop. The Yukon stopped near milepost 29.

Trooper Strickland positioned himself behind the Impala (the following vehicle) which "ducked" behind an 18-wheeler. As Trooper Strickland approached the Impala, he saw that the Impala was following the 18-wheeler at less than two vehicle lengths, which Strickland knew was an unsafe distance. Trooper Strickland activated his emergency lights to initiate a traffic stop for following too closely in violation of Louisiana Revised Statute 32:81. The Strickland stop occurred near milepost 29.5, or approximately one-half mile east from where Trooper Peart stopped the Yukon.

Trooper Strickland made contact with defendant Guardiola, the driver of the Impala. Guardiola displayed multiple signs of nervousness, including sweaty hands (Trooper Strickland always shakes the driver's hand) and frequently breaking eye contact. Guardiola

stated that he was going to meet his brother regarding a job at a refinery. However, he could not identify the refinery or the city or area where it was located. Guardiola stated he was going to contact his brother, who was staying in a hotel, but Guardiola could not identify the hotel. Guardiola advised that the Impala belonged to his uncle, but he had no paperwork for the vehicle. Guardiola stated that he was traveling from Houston, Texas, which from Trooper Strickland's training and experience is one of the largest entry points for narcotics.

Based on the totality of the circumstances, Trooper Strickland believed that Guardiola was involved in criminal activity. Strickland returned to his unit to run a driver's license check, look for warrants, and contact Trooper Roger Cason (a K-9 handler) for backup. (For officer safety, the troopers always call for backup prior to requesting consent to search a vehicle.) Cason, along with his K-9 ("Rico"), was close by; he arrived at the scene within one or two minutes.

About this time, Strickland was contacted by Trooper Peart over the radio, who asked him to give him a call on his cell phone. Both troopers testified that all of the state troopers use the same radio, so trooper-to-trooper conversations are usually held by cell phone or by the instant message program on their in-car computers. This keeps the radio traffic clear for the dispatchers. During the cell phone call, Trooper Peart asked Trooper Strickland who was the registered owner of the Impala. Strickland responded that a Mr. Aviles was the registered owner. Trooper Peart confirmed that Aviles was the driver of the Yukon. At that point, the troopers confirmed that Aviles and Guardiola were traveling together.

After Cason arrived, Trooper Strickland approached Guardiola and requested consent to search the Impala. Guardiola responded: "If you have a warrant." Trooper Strickland construed that comment as a refusal, and he confirmed to Guardiola that Guardiola had the right to refuse the search. However, he explained that Trooper Cason was going to run Rico around the Impala for an open-air search. Rico, an experienced and certified narcotics K-9, immediately alerted on the Impala. Cason notified Strickland that the dog had alerted, and Strickland began his search.

Strickland quickly located a cardboard box on the backseat. When he opened the box, there was a Tupperware container that was double wrapped in plastic bags. Inside were one kilogram of methamphetamine and .75 pounds of cocaine. Strickland placed Guardiola under arrest and notified Peart of the discovery of the drugs. Peart, who was conducting a consensual search of the Yukon, immediately arrested Aviles for a drug conspiracy. Two-way radios, both tuned to channel 2, were also located in each vehicle. Guardiola and Aviles were Mirandized, but neither made inculpatory statements. No drugs were found in the Yukon.

**The Traffic Stops**

"The reasonableness of traffic stops and investigative detentions of motorists who are suspected of criminal activity is analyzed under the framework established in Terry v. Ohio, 392 U.S. 1 (1968)." United States v. Rosales-Giron, 592 Fed.Appx. 246 at *4 (5th Cir. 2014); United States v. Stevens, 487 F.3d 232, 244 (5th Cir. 2007). "Under Terry, we determine the reasonableness of an investigative stop by examining: (1) whether the officer's

action of stopping the vehicle was justified at its inception, and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop." Id.

For a traffic stop to be justified at its inception, an officer need only have reasonable suspicion that "some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." United States v. Lopez-Moreno, 420 F.3d 420, 430 (5th Cir. 2005). "Reasonable suspicion" analysis requires assessing the totality of the circumstances to ascertain the reasonableness of the suspicion. United States v. Powell, 732 F.3d 361, 369 (5th Cir. 2013) (citation omitted). This is consistent with the "touchstone of Fourth Amendment analysis [being] reasonableness", which "requires a balancing of the public interest with an individual's right to be free from arbitrary intrusions by law enforcement." United States v. Brigham, 382 F.3d 500, 507 (5th Cir. 2004) (en banc).

The Supreme Court held unanimously in Whren v. United States, 517 U.S. 806 (1996): "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Id. at 810. "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed, or was in the process of committing, an offense." United States v. Zavala, 541 F.3d 562, 575 (5th Cir. 2008) (quoting United States v. Castro, 166 F.3d 728, 733 (5th Cir. 1999) (en banc)). Therefore, probable cause to make a traffic stop exists when a defendant commits a traffic violation and a law-enforcement officer observes the violation. United States v. Khanalizadeh, 493 F.3d 479, 482 (5th Cir. 2007).

"The rule established by the Supreme Court in Whren allows officers to justify a stop by the occurrence of a traffic violation even though this is not the real reason for the stop." United States v. Cole, 444 F.3d 688, 689 (5th Cir. 2006). The legal justification for the traffic stop must simply be "objectively grounded." Id.

Terry's first prong is met in this case. Trooper Strickland had probable cause to believe that the driver of the Impala was following the 18-wheeler at an unsafe distance in violation of La. R.S. 32:81. Trooper Peart had probable cause to believe the driver of the Yukon committed improper lane usage in violation of La. R.S. 32:79.

As to Terry's second prong, whether the officer's actions were reasonably related in scope to the circumstances that justified the stop, an officer's actions are not reasonably related if the officer detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless the officer develops reasonable suspicion of additional criminal activity in the meantime. Brigham 382 F.3d at 506. If the officer develops reasonable suspicion of additional criminal activity during the investigation of the circumstances that originally caused the stop, the officer may further detain the occupants for a reasonable time while appropriately attempting to dispel this reasonable suspicion. Id.; United States v. Aguilera, 2014 WL 7404535, at *3 (N.D. Tex.).

The Fifth Circuit has held that an officer may examine driver's licenses and vehicle registrations and run computer checks as part of the investigation of the circumstances that originally caused the traffic stop. United States v. Pack, 612 F.3d 341, 349-350 (5th Cir. 2010). The officer may also ask about the purpose and itinerary of the occupants' trip as part

of this investigation, because these questions are considered to be reasonably related in scope to the investigation of the circumstances that caused the stop. Id. Additionally, an officer may ask questions on subjects unrelated to the circumstances that caused the stop, so long as these unrelated questions do not extend the duration of the stop. Id. The reasoning behind this rule is that the Fourth Amendment protects against detention, not questioning. Id. Thus, no Fourth Amendment harm is done where the officer asks the occupants of a vehicle questions that are unrelated to his reason for stopping the vehicle while waiting for routine computer checks to be processed. Id.

Both troopers acted promptly and professionally in investigating the reasonable suspicion of criminal activity that arose during the traffic stop. As soon as Strickland made contact with Defendant Guardiola (the driver of the Impala), Strickland noticed that Guardiola was visibly nervous and would not make eye contact when answering basic questions. Trooper Strickland shook Guardiola's hand and noticed that it was very sweaty. Guardiola stated that he was going to meet his brother about a job at a refinery, but Guardiola could not identify the refinery or what city it was in. *Guardiola had no idea where he was going*. Guardiola stated that he was traveling from Houston, Texas, which Trooper Strickland knew is a major entry point for narcotics. Guardiola could not find any paperwork for the vehicle, which Guardiola said was owned by his uncle. Trooper Strickland returned to his car to run a license and criminal history check on Guardiola.

In the meantime, Trooper Peart was talking with Defendant Aviles, the driver of the Yukon. When asked for the SUV's paperwork, Aviles produced an insurance card for the

Page 8 of 12

Impala. When Aviles noticed his mistake, he snatched the card out of Trooper Peart's hand and gave Peart a card for the Yukon. Trooper Peart returned to his vehicle to run checks on Aviles. While doing so, he contacted Trooper Strickland, who stated that the registered owner of the Impala was a Mr. Aviles. Trooper Peart reported that Aviles was the driver of the Yukon. Peart told Strickland that Defendants were in fact traveling together and drugs would be found in the Impala. He was right.

**The K-9 Search of the Impala**

In <u>Rodriguez v. United States</u>, 135 S.Ct. 1609 (2015), the Supreme Court concluded that a K-9 search of a vehicle during a routine traffic stop is unlawful when it prolongs the stop beyond the time necessary for an officer to conduct certain inquiries and issue a ticket, *unless* reasonable suspicion of criminal activity distinct from the traffic offense is developed that is ordinarily demanded to justify detaining an individual. <u>Id</u>. at 1614-1615.

Trooper Strickland had reasonable suspicion that Guardiola was involved in criminal activity, and that reasonable suspicion justified any brief delay the K-9 search of the Impala may have caused. Trooper Cason and K-9 Rico arrived before the traffic stop was completed and before Trooper Strickland asked for and was denied consent to search the Impala. The traffic stop was not unreasonably delayed or prolonged so that Trooper Cason could run Rico around the car. Furthermore, Rico's positive alert for the presence of narcotics gave Trooper Strickland probable cause to search Defendant's vehicle. <u>United States v. Sanchez-Pina</u>, 336 F.3d 431, 444 (5th Cir. 2003). Therefore, Strickland did not need Guardiola's consent. The search of the Impala was lawful.

**Consent to Search the Yukon**

Although no drugs were found in the Yukon, Trooper Peart found a 2-way radio and paperwork for the Impala. This evidence appears incriminating because it ties the two drivers together for a drug conspiracy. Thus, the court must address the validity of Aviles' consent to search the Yukon.

In determining whether a consent to search is voluntary, the Fifth Circuit reviews several factors, no one of which is dispositive. These factors include: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of her right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. United States v. Jenkins, 46 F.3d 447, 451 (5th Cir. 1995).

An analysis of the relevant factors shows that Aviles freely and voluntarily consented to the search of the Yukon. Aviles was not in custody; Trooper Peart was professional and did not apply coercive procedures to obtain consent; Aviles was very cooperative; Aviles was told he had the right to refuse consent; and Aviles knew no drugs would be found in his vehicle.

Immediately after Aviles signed the written consent form, Trooper Strickland notified Trooper Peart that he had found drugs in the Yukon. Peart immediately arrested Aviles for participating in a drug conspiracy. At that point, Peart not only had consent to search the

Yukon, he had independent probable cause that evidence of illegal drug trafficking would be found in the Yukon. The search of the Yukon was lawful.

**Racial Profiling**

Defendants claim they were stopped because they were Hispanic. Troopers Peart and Strickland testified credibly that they were unable to tell the race or ethnicity of the drivers until the stop was made. There is no evidence to the contrary.

**Summary and Conclusion**

Both traffic stops were proper under Terry. Both drivers committed traffic violations. The troopers had reasonable suspicion that the drivers were engaged in criminal activity. That suspicion grew stronger as the traffic stops continued. Trooper Strickland did not delay the stop to request a K-9 search of the Impala. The K-9 was already present at the time Guardiola refused consent to a search. Trooper Peart's search of the Yukon was made pursuant to Aviles' voluntary consent and probable cause. There is no basis to suppress the evidence found in the search of either vehicle. Accordingly;

IT IS RECOMMENDED that the Motions to Suppress (Docs. 33 and 36) be denied.

**Objections**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this Report and Recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 45(b). A party may respond to another party's objections within **fourteen (14) days** from the filing of the objections.

Counsel are directed to furnish a paper courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 21st day of October, 2016.

*[signature]*

Mark L. Hornsby
U.S. Magistrate Judge